IN UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

K.J.,[1]

      Plaintiff.

v.

UNITED STATES OF AMERICA;
OFFICER LARRY MARTIN, and
FEDERAL CORRECTIONAL COMPLEX HAZELTON;

Defendants.

ELECTRONICALLY
FILED
Jun 08 2021
U.S. DISTRICT COURT
Northern District of WV

Civil Action No.: **1:21-cv-74 (Kleeh/ Aloi/Williams)**

## COMPLAINT

Plaintiff, K.J., was sexually assaulted and battered while incarcerated in a female facility at Federal Correctional Complex Hazelton ("FCC Hazelton").  By and through her attorneys, K.J. brings claims based on the Eighth Amendment to the United States Constitution pursuant to the legal standards set forth in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971), and based upon the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.* As a result of the repeated assaults visited upon her while she was an inmate at FCC Hazelton, K.J. suffered injuries, including: physical battery, sexual assault, and the dignitary injury of being forced to endure sexual activity to which she did not consent, for which she had neither the legal nor volitional capacity to consent, and from which

---

[1] These initials, and all initialized references to inmate victims of sexual assault at FCI Hazelton, are pseudonyms used to protect the subject's identities for personal safety reasons. These individuals have legitimate fears of retaliation from correctional officials and/or present or former inmates for making public allegations regarding correctional officers.

1

she had no lawful means of escape. For her complaint against Defendants, K.J. states as follows:

## PARTIES

1. Plaintiff K.J., was at all times relevant to this complaint, in the custody of the Federal Bureau of Prisons ("BOP"), including at FCC Hazelton, which is the prison facility located within the Northern District of West Virginia where the sexual assaults described herein occurred.

2. Defendant, the United States of America, is a sovereign entity named herein pursuant to the Federal Tort Claims Act and oversees the Federal Bureau of Prisons, which is responsible for the care and custody of federal inmates.

3. Defendant, Larry Martin ("Defendant Martin") was at all times relevant to this complaint employed by the BOP as a Correctional Officer at FCC Hazelton and was responsible for, among other things, maintaining security and providing for the safekeeping, care, and protection of inmates incarcerated there, including plaintiff, K.J.

4. Defendant Martin was at all times relevant to this complaint acting under color of law and within the scope of his employment with the United States BOP. He is named in his individual capacity.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 & 1346 (b)(1) as the claims in this case are brought against the United States of America under the Federal Tort Claims Act 28 U.S.C. 2671, *et seq.* and against the individual Defendant under the Eighth Amendment to the United States Constitution,

pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388 (1971).

6. Plaintiff filed an Administrative Claim (Form 95), which was received by the Federal Bureau of Prisons Mid-Atlantic Regional Office on September 29, 2020.

7. By letter dated March 1, 2021, Michael D. Frazier, Regional Counsel, Mid-Atlantic Region, Federal Bureau of Prisons, expressed that the claim is denied and that "If you are not satisfied with our determination in this matter, you may file suit in the appropriate U.S. District Court not later than six months after the date of this letter."

8. Plaintiff has exhausted all obligatory administrative remedies and this matter is ripened for the bringing of this civil action against Defendant United States of America.

9. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1402(b), as the acts and omissions complained of by Plaintiff occurred in Preston County, West Virginia, which is in the Northern District of West Virginia.

## FACTS

10. At FCC Hazelton, the BOP employs correctional officers, facilities staff, and management to oversee and operate the prison facility. The correctional officers are trained, managed, overseen and paid by the BOP through the United States Department of Justice serving "investigative or law enforcement" functions.

11. As a federal inmate, K.J. was committed to the Government's care, custody, and control and while in such custody, federal law specifically requires the BOP to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States" and to "provide protection ... of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2)-(3).

3

12. As a federal inmate, K.J.'s options for escaping sexual assault or for resisting the sexually abusive conduct of a guard were limited. K.J. – like all inmates at FCC Hazelton – relied on employees to protect her from sexual abuse by guards and staff.

13. As a condition of his employment, Defendant Martin was or should have been required to attend and complete the BOP's Correctional Training Program, Phases I (an introductory two-week course) and II (a three-week long course). He was or should also have been required to attend an additional week of training specific to the supervision of female offenders. Moreover, annually, or otherwise periodically, Defendant Martin would have received refresher training and continuing education on the prohibition against sexual abuse of inmates.

14. The BOP's policies are contained in documents called "program statements" which set forth rules and procedures that all BOP employees are required to follow.

### BOP Program Statement 3420.11 – Standards of Employee Conduct

15. Program Statement 3420.11 sets out the duties and responsibilities of all BOP employees. It requires that employees, "[A]s soon as practicable (but no later than 24 hours) report to their CEO (or other appropriate authority such as the Office of Internal Affairs or the Office of the Inspector General) any violation, appearance of a violation, or attempted violation of these Standards or of any law, rule, or regulation. Every employee is required to immediately report to management any act or omission by any person that could result in a breach of institution security. Failure by employees to follow these regulations and policy or any other Bureau policy or relevant regulation(s) could result in disciplinary action, up to and including removal."

16. Program Statement 3420.11 (Standards of Employee Conduct) mandates that "[n]o employee shall engage in, or allow another person to engage in, sexual behavior

4

with an inmate. There is never any such thing as *consensual* sex between staff and inmates."

17. Program Statement 3420.11 states that BOP employees are subject to administrative action, up to an including removal, for any inappropriate contact, sexual behavior, or relationship with inmates, regardless of whether such contact constitutes a prosecutable crime. Physical contact is not required to subject an employee to sanctions for misconduct of a sexual nature.

18. Program Statement 3420.11 further states that "Title 18, U.S. Code Chapter 109A provides penalties of up to life imprisonment for sexual abuse of inmates where force is used or threatened. Sexual contact is defined as the intentional touching of the genitalia, anus, groin, breast, inner thigh, or buttocks with the intent to abuse, humiliate, harass, degrade, arouse, or gratify the sexual desire of any person. All allegations of sexual abuse will be thoroughly investigated and, when appropriate, referred to authorities for prosecution".

19. Each new BOP employee, contractor, and volunteer must receive and sign a form acknowledging receipt of Program Statement 3420.11.

20. As a condition of his employment, Defendant Martin did or should have signed an acknowledgement that he received the updated version of Program Statement 3420.11.

## BOP Program Statement 5324.12 - Sexually Abusive Behavior Prevention and Intervention

21. BOP Program Statement 5324.12 (Sexually Abusive Behavior Prevention and Intervention Program) implements zero tolerance toward all forms of sexual activity,

including sexual abuse and sexual harassment, and provides guidelines to address prohibited and/or illegal sexually abusive behavior.

22. Program Statement 5324.12 is the controlling BOP policy addressing the prevention of, and intervention upon, sexually abusive behavior. It is disseminated agency-wide and applies to all facilities operated by the BOP and every staff member working within each correctional facility.

23. Program Statement 5324.12 lays out duties and responsibilities with respect to conduct for all BOP employees, and mandates particular staff and agency reporting duties with respect to sexually abusive behavior, including concerning incidents or possible incidents of sexual abuse or sexual harassment: it mandates that "[a]ll staff must report information concerning incidents or possible incidents of sexual abuse or sexual harassment to the Operations Lieutenant, or where appropriate, in accordance with the Program Statement 3420.11."

24. BOP policy requires the training of all employees who may have contact with inmates on how to fulfill their responsibilities under agency sexual abuse and sexual harassment prevention, detection, reporting, and response policies and procedures.

25. Inmates, employees, and members of the public may file a complaint at the BOP facility where an incident of sexual abuse occurred; through BOP's Office of Internal Affairs; or with the Department of Justice Office of Inspector general (OIG).

26. In accordance with the agency's own Standards of Employee Conduct, BOP employees must report any violation of those Standards, or any rule or law within one business day of the incident to their Chief Executive Officer (CEO), OIA, or the OIG. Decisions regarding disciplinary action in cases where the allegations are sustained are

managed by BOP's Human Resources Management (HRM) and BOP's Office of General Counsel.

### *The Sexual Assaults of K.J.*

27.  At all times relevant to this complaint, Defendant Martin worked as a "night officer" at FCC Hazelton and routinely reported for his shift from 2 p.m. to 11 p.m.

28. On information and belief, Defendant Martin had taken a leave of absence for a period of at least three weeks in or around late October of 2019.

29. On information and belief, Defendant Martin's leave of absence was related to a requirement that he seek treatment for problematic use of drugs and/or alcohol.

30. In or around late November of 2019, K.J. was told by another inmate, K.W., to report to Defendant Martin's office.

31. Obeying the directive, K.J. walked to Defendant Martin's office, whereupon he immediately told her how beautiful she was and that he had searched for pictures of her on the internet while on a recent leave of absence and that he had saved them to his computer at home.

32.  This conduct by Defendant Martin alarmed K.J. and she attempted to turn around and leave the doorway of his office.

33. Defendant Martin ordered K.J. to remain in his office and she complied with his order.

34. Defendant Martin told K.J. that this shift was his first since he had taken a leave of absence and that he had attended a detoxification program during his recent leave of absence and had suffered bouts of suicidality.

35. Defendant Martin further informed K.J. that his fellow officer, Tristan Martin, had given him pictures of K.J. and that these images had given him "a reason to live".

7

36. Tristan Martin continued to encourage and facilitate the sexual abuse of K.J. by Defendant Martin over the following weeks.

37. Defendant Martin further informed K.J. that he was starting a bank account and planned to deposit $100 from each of his paychecks until her release. He suggested that this bank account was prudent planning for the life that they would live together upon her release and that this "nest egg," such that it was, would be a form of personal insurance for K.J. in the even that she decided to "leave" him.

38. The conversation further devolved into graphic sexualized commentary, wherein Defendant Martin expressed his desire to impregnate K.J. against her will and further, to "eat her ass for breakfast".

39. These statements caused Plaintiff to fear for her safety.

40. Over the week following this first conversation, K.J. was called by Defendant Martin to his office, where he informed her that he had bought engagement rings and demanded that she enter his office to see the pictures of these rings on his computer.

41. As ordered, K.J. entered Defendant Martin's office and stood close enough to his desk to see what was on the computer screen, whereupon he also showed her "proof" that he had started the savings account that he had mentioned in their first conversation at his office door.

42. The two of them being alone, Defendant Martin then ordered K.J. to put her fingers in her vagina and then into his mouth.

43. K.J. did not have any choice but to comply with Defendant Martin's order.

44. K.J. complied with Defendant Martin's order to put her own fingers in her vagina and then into his mouth.

45. Defendant Martin then instructed K.J. to come closer to him, whereupon he put his hand K.J.'s pants and used his fingers to repeatedly and forcibly penetrate her vagina while telling her to hold still.

46. As soon as Defendant Martin allowed her to do so, K.J. left his office.

47. Later that evening, Defendant Martin approached K.J. on the compound and ordered her to his office again purportedly so that he could show her something on his computer.

48. K.J. attempted to refuse this order from Defendant Martin but was afraid that he would subject her to discipline or place her in the Special Housing Unit (SHU) as punishment for refusing his orders.

49. K.J. complied with Defendant Martin's order and followed him to his office, where he again put his hands down K.J.'s pants.

50. Defendant Martin used two fingers to repeatedly and forcibly penetrate K.J.'s vagina.

51. In the days following these instances of sexual assault, Officer Martin brought K.J. a watch with "I [heart shape] U" engraved in it.

52. Defendant Martin subsequently brought K.J. a necklace and a pair of earrings.

53. Defendant Martin also brought K.J. a "wedding band" and told her that he believed that they were now married and instructed her to wear the ring on the compound.

54. When married inmates are committed to the custody of the Bureau of Prisons, they are permitted to keep a simple metal wedding band to signify that they are married. Wedding bands, unlike some plastic jewelry available for purchase at the commissary of most facilities, cannot be acquired once an inmate has entered the facility. Wedding

9

bands are permitted to be worn only provided that an inmate is married on entry to the facility – possession of this piece of jewelry by an inmate who did not enter with it should have raised the suspicion of other guards at FCC Hazelton.

55. K.J. was unmarried when she was committed to the custody of the Bureau of Prisons.

56. K.J. asked Defendant Martin not to bring her such contraband items because she feared that if these items were discovered she might be punished for possessing, or wrongly blamed for his sexually abusive conduct.

57. Approximately one week after the first assault in his office, Defendant Martin ordered K.J. to come to his office again.

58. On this occasion, Defendant Martin thrust his hand down the front of her pants and between her legs and used his fingers to repeatedly and forcefully penetrate her anus.

59. Defendant Martin produced a plastic bag with lubricant in it and explained that he had sneaked it into the workplace for the express purpose of facilitating this assault upon her.

60. Defendant Martin gave K.J. an anatomical sex toy (a "dildo") and ordered her to take it to her living quarters, insert it in her vagina, and return it to him in a plastic bag.

61. K.J. complied with Defendant Martin's order, and returned the object to him at his office, whereupon he ordered her to watch him as he put it in his mouth and sucked on it.

62. In the subsequent weeks, Defendant Martin routinely ordered K.J. to supply him with explicit "love" letters.

63. Out of fear for her safety, K.J. complied with Defendant Martin's order.

10

64. K.J. did not report these sexual assaults by Defendant Martin for fear of retaliation by Defendant Martin and the other guards at FCC Hazelton.

65. K.J. attempted to signal to any officer who might be monitoring the closed-circuit video system providing a view to the corridor outside of Defendant Martin's office to communicate the suspicious nature of her frequent appearances at his door. K.J. shook her head "no" in an exaggerated fashion when Defendant Martin would request that she come into his office close to his desk.

66. Defendant Martin used the intercom system on the housing unit to call K.J. to his office on a daily basis for weeks. The sheer frequency with which Defendant Martin called K.J. should have caused other officers on the compound to make further inquiries to ensure the safety of K.J.

67. Defendant Martin demanded that K.J. stay in the housing unit during his shifts and ordered her to abstain from attending programming in the Education Building, or any activities outside of the housing unit, while he was working.

68. Defendant Martin began to monitor K.J. so closely that when he saw her getting ready to leave the housing unit to attend programming or activities, he would approach her and demand that she stay in the housing unit.

69. This restriction to her movement isolated K.J. to the extent that she was prevented from earning the programming credits that she needed for eligibility for early release under the First Step Act.

70. Over the following weeks, Defendant Martin told K.J. that he was keeping the explicit letters that he had ordered her to write to him to "use against her" if she "left him" or if she otherwise failed to submit to his sexual demands.

71. Defendant Martin routinely threatened to hand the letters that he had ordered her to write him over to facility administrators, telling her she would be placed in the SHU as punishment.

72. On other occasions, Defendant Martin informed K.J. that he was saving these explicit letters in a scrapbook to give to "their grandchildren".

73. Defendant Martin's conduct became increasingly brazen in the following weeks. Over an intercom system that could be heard by staff and inmates compound-wide, he would repeatedly call K.J. to his office, and he also played love songs over the intercom.

74. On one occasion, Defendant Martin called K.J. to his office so that he could show her pictures of his family from Thanksgiving, a picture of his bed, and a picture of his fishing poles, all of which he had emailed to his BOP email account for the purpose of opening them on his work computer in order to show her.

75. Defendant Martin told K.J. that he had searched on his home computer for images that she had posted on social media prior to her incarceration, informing her that he was "stalking her".

76. Defendant Martin moreover informed her that she should avoid another inmate in her living quarters who was diagnosed with genital herpes. Defendant Martin also informed her that he had asked another officer, Tristan Martin, to access her private medical information on his behalf so that he could determine whether she had been diagnosed or treated for any sexually transmitted infections.

77. On December 14, 2019, K.J.'s mother, L.C., received a text message regarding her daughter from an unknown number.

78. This text message was sent from Defendant Martin's cell phone number.

12

79.  In the hours following the text message, L.C. received several calls from this number and did not recognize the male voice, but the caller sounded inebriated and identified himself as the guard who was "in love" with K.J.

80.  L.C. received over a dozen calls on her home and cell phones from this caller.

81. When L.C. told the caller that she was scared and was going to call the prison because she feared for her daughter's safety, the caller informed her that he was going to drive to her home in Minnesota and kill her.

82. L.C. called FCC Hazelton and reported the calls and text messages.

83. Defendant Martin either resigned or was removed from his position on or about December 14, 2019.

84. Defendant Martin continued to call L.C. and to send her menacing text messages until early January, 2020.

85.  On December 20, 2019, K.J. was searched and a letter written by K.J. to Defendant Martin was found on her person.

86. K.J. immediately reported to a facility administrator, Ms. Ford, that she had been sexually assaulted, harassed, and sexually abused by Defendant Martin for several weeks.

87. K.J. also immediately informed Ms. Ford that Officer Tristan Martin had been aware of and had facilitated the sexually abusive conduct of Defendant Martin toward K.J.

88. Ms. Ford made a call in K.J.'s presence demanding that Officer Tristan Martin immediately leave the compound.

89. On information and belief, Officer Tristan Martin is still employed by the BOP but is not assigned to the female facility at FCC Hazelton.

13

90. On December 20, 2019, K.J. also reported the sexual assaults, abuse, and harassment to a facility psychological services administrator, Ms. Ivy.

91. On information and belief, Ms. Ivy filed a formal PREA report identifying Defendant Martin as the perpetrator of sexual assaults against K.J. on the day that K.J. reported the assaults to her.

92. K.J. was immediately placed in the SHU.

93. BOP policy mandates that the SHU is not to be used as a means of punishing victims of sexual assault. BOP policy mandates that the SHU is not to be used as a means of punishing victims of sexual assault. Yet, this is precisely the way that the SHU was used in K.J.'s case.

94. BOP policy also mandates that the SHU is used as a temporary means of securing the safety of an inmate who has been sexually abused or assaulted by a guard. However, Defendant Martin had already either been allowed to resign or had been terminated on December 14, 2019.

95. Pursuant to BOP policy, each facility that assigns an inmate who has been sexually assaulted by a guard to involuntary segregated housing is to do so only until an alternative means of separation from likely abusers can be arranged, and such an assignment shall not ordinarily exceed a period of 30 days.

96. K.J. was housed in SHU from December 20, 2019, until February 13, 2020.

97. In cases where an involuntary segregated housing assignment is made for the purpose of separating an inmate from the guard who has sexually assaulted her, BOP policy requires clear documentation of: (1) The basis for the facility's concern for the inmate's safety; and (2) the reason why no alternative means of separation can be arranged.

14

98. K.J.'s confinement in SHU subjected to the formal reviews required by BOP policy after 72 hours, nor was it reviewed at 30-day intervals thereafter.

99. BOP policy requires that all staff are trained on its zero-tolerance policy for sexual abuse and sexual harassment; inmates' right to be free from sexual abuse and sexual harassment; and the right of inmates and employees to be free from retaliation for reporting sexual abuse and sexual harassment.

100. K.J.'s bunkmate, K.H., who was known to have personal knowledge of the sexual assaults and sexual abuse of K.J. by Defendant Martin, was also placed in SHU with K.J.

101. K.J. was not provided with an explanation, nor was she told the rationale for her confinement in SHU, except the informal explanation given to her by Officer Squires, who informed K.J. that he was of the view that she was responsible for her own sexual assault and that she and K.H. would be held together in SHU for a "very long time".

102. Despite this mandatory training, Captain Squires informed both K.J. and K.H. that although they could not technically be punished for being either victims of or witness to PREA violations, respectively, that he nevertheless had "ways of punishing them", to include a prolonged housing assignment for both inmates in the SHU at FCC Hazelton.

103. BOP policy mandates that when an inmate is placed in segregated housing involuntarily, for the purpose of protecting the inmate from further sexual abuse, access to programs, privileges, education, or work are not to be interrupted, to the extent possible. If they are limited, the Chief of Correctional Services is required to ensure that documentation exists reflecting the limitation, duration, and rationale for limitation.

15

104. While she was in SHU, Plaintiff had no access to email to communicate with her mother, who was worried by the threats made against her by Defendant Martin and the sudden cessation of contact from K.J.

105. Both K.J. and K.H. were held in SHU for several weeks before being transferred together to FCI Aliceville.

106. Retaliation against survivors of sexual assault in BOP facilities is a well-known problem and it is strictly prohibited by BOP Sexually Abusive Behavior Prevention and Intervention Program Statement 5324.12.

107. On January 8, 2020, K.J. was interviewed by an OIG investigator, Agent Ortiz, and another investigator from OIG. The interview was recorded.

108. Agent Ortiz informed K.J. that he would do a "thorough investigation" and that ultimately the results of his investigation would determine whether or not the case of her sexual assault by Defendant Martin would be referred for criminal prosecution.

109. During this interview, OIG Agent Ortiz repeatedly suggested to K.J. that she was responsible for her own sexual assault at the hands of Defendant Martin.

110. Agent Ortiz repeatedly asked K.J. if she appreciated being sexually assaulted by Defendant Martin. Agent Ortiz asked K.J. questions such as "did you like it [being sexually assaulted]?" and "did you enjoy it [being sexually assaulted]?".

111. K.J. never saw Agent Ortiz or any other OIG investigator again. Nor was she informed of the outcome of his "thorough investigation" of the circumstances under which she was sexually abused and repeatedly assaulted by Defendant Martin.

112. K.J. was kept in the SHU until February 13, 2020, whereupon she was placed in "black box" handcuffs and leg shackles and transported by bus to an airstrip in

16

Pennsylvania and placed on an airplane destined for the Oklahoma Transfer Center, along with K.H.

113. On the airplane, the Air Marshall identified K.J. and K.H. as "those two" to another Air Marshall and warned the other Air Marshall that if he wanted to keep his job then he would not talk to them.

114. Once at Oklahoma Transfer Center, K.J. informed the guard performing her health intake screening that the reason she was being transferred was that she had been the victim of a sexual assault by a guard at FCC Hazelton. The guard assigned to her health screening noted that there was no information in her inmate file concerning the sexual assault at FCC Hazelton.

115. On March 3, 2020, K.J. and K.H. were woken up in the middle of the night and put on a plane destined for Lovejoy, Georgia.

116. Once in Lovejoy, Georgia, K.J. was placed on a bus and travelled for ten hours by bus in handcuffs and leg shackles.

117. During this bus ride, K.J. begged the officer in charge of transportation for sanitary pads or tampons and she was denied these basic supplies.

118. K.J. arrived at FCI Aliceville covered in menstrual blood and went through intake. She remains at FCI Aliceville today.

## Count I –Defendant Martin: Sexual Assault and Battery – *Bivens* (Deprivation of Constitutional Rights)

119. K.J. re-alleges and incorporates by reference all of the preceding allegations of this Complaint.

17

120.  As an inmate in the custody of the United States BOP, K.J. had a clearly established right under the Eighth Amendment to the United States Constitution not to be subjected to cruel and unusual punishment while incarcerated.

121. Defendant Martin's actions constitute cruel and unusual punishment in the forms of sexual abuse, sexual assault and battery.

122. K.J. was not sentenced to be subjected to sexual assault or any form of sexual abuse. Sexual assault is not a legitimate form of punishment. Sexual abuse, sexual assault and battery are not legitimate forms of punishment ancillary to any term of imprisonment.

123. Sexual abuse, sexual assault and battery serve no legitimate penological purpose.

124. All of Defendant Martin's acts and omissions were taken while acting under color of law and in the scope and course of his position as a Corrections Officer at FCC Hazelton.

125.  Defendant Martin, individually, failed in his duty to provide K.J. with constitutionally safe and secure conditions or confinement.

126. Defendant Martin acted intentionally, maliciously, oppressively and/or with gross negligence against Plaintiff's constitutional rights.

127. As a direct and proximate result of Defendant Martin's misconduct, K.J. was subjected to physical and emotional injury, depression, post-traumatic stress, embarrassment, and other damages, all or some of which shall continue indefinitely or permanently, as well as retaliation, and Defendant Martin is consequently liable to Plaintiff for all of her compensatory damages recognized and allowable under applicable law.

18

128.  Defendant Martin's conduct was of such a quality and nature as to warrant his liability for punitive damages, in accordance with applicable law.

## COUNT II – CLAIMS AGAINST THE UNITED STATES OF AMERICA UNDER THE FTCA: NEGLIGENCE

129.  K.J. re-alleges and incorporates by reference all of the preceding allegations of this Complaint.

130. Defendant the United States of America is responsible for the oversight of its employees, which includes officers and staff at federal correctional institutions, including FCC Hazelton.

131.  Pursuant to the Federal Tort Claims Act, the United States is liable for damages caused by the negligent or wrongful acts of its employees acting within the scope of their employment, under circumstances where the United States, if a private person, would be liable in accordance with the laws of the State of West Virginia.

132. Federal law specifically requires the BOP to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States" and to "provide for the protection . . . of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2)-(3).

133. Defendant United States and the supervisors and employees of FCC Hazelton have a duty to provide inmates, being in their custody, with a safe and secure environment, free of dangers, including the dangers of sexual harassment and sexual assault.

134.  As a premises owner/operator, the United States has a duty to provide inmates with a reasonably safe place, which specifically includes a place reasonably free and safe

from known or suspected sexual abusers and/or individuals who pose a foreseeable risk of sexual abuse or rape.

135. Correctional officers and other prison officials at FCC Hazelton have a non-discretionary duty, pursuant to PREA, to enforce a policy of "zero-tolerance" with respect to sexual abuse of inmates by staff.

136. Correctional officers and other prison officials at FCC Hazelton have a duty to protect inmates from harm caused by correctional officers and other prison officials.

137. Correctional officers and other prison officials at FCC Hazelton have a duty to disallow or sufficiently monitor and supervise one-on-one inmate/officer interactions.

138. Correctional officers and other prison officials at FCC Hazelton have a duty to disallow or sufficiently monitor and supervise employee use of BOP computers to ensure that this equipment is not being used in furtherance of sexual harassment of inmates.

139. Correctional officers and other prison officials at FCC Hazelton have a duty to disallow or sufficiently monitor and supervise employee access to sensitive information in inmate files to ensure that it is not being used to facilitate sexually abusive conduct.

140. Correctional officers and other prison officials at FCC Hazelton have a duty to house inmates in a safe and secure manner.

141. Pursuant to 28 C.F.R. § 115.31, BOP and FCC Hazelton had a non-discretionary duty to train employees on how to prevent sexual abuse and sexual harassment, the right of inmates to be free from sexual abuse and harassment, the dynamics of sexual abuse and harassment, the common reactions of sexual abuse and harassment victims, and how to detect and respond to signs of threatened and actual sexual abuse and to ensure that such training was properly followed. BOP and FCC Hazelton breached this duty and such breach was a proximate cause of the injuries and damages alleged herein

20

142. BOP and FCC Hazelton had a non-discretionary duty to train employees and advise inmates of their right to be free from retaliation for reporting incidents of sexual harassment and sexual abuse by corrections officers and to ensure that such training was properly followed. Plaintiff was retaliated against, and therefore BOP and FCC Hazelton breached this duty and such breach was a proximate cause of the injuries and damages alleged herein.

143.   Pursuant to 28 C.F.R. § 115.17, BOP and FCC Hazelton officials have non-discretionary duties with respect to the hiring, promotion, and periodic review of their employees. Those non-discretionary duties include duties to consider any incidents of sexual harassment, whether the employee has engaged in sexual abuse, and whether the employee has been convicted or civilly adjudicated of sexual abuse.

144. Upon information and belief, BOP and FCC Hazelton failed to perform their non-discretionary duties with respect to Defendant Martin or failed to appropriately responsively act if they did perform such duties.

145. BOP supervisory officials have a duty to monitor, supervise, train, and discipline correctional staff at FCC Hazelton to ensure that correctional staff properly perform their PREA-mandated duties so that inmates' Eighth Amendment rights are not violated.

146. Prison officials and other employees at FCC Hazelton knew or should have known that Defendant Martin should not have been permitted to have unsupervised access to inmates, including K.J., to whom he posed an excessive and unreasonable risk.

147. Prison officials and other employees at FCC Hazelton knew or should have known that Defendant Martin might sexually assault an inmate such as Plaintiff, but they failed to appropriately act so as to avoid the assault upon Plaintiff.

148. Once Defendant Martin began his sexual assaulting of Plaintiff, prison officials and other employees at FCC Hazelton knew or should have known that it was occurring, but they failed to appropriately act to halt the assaults.

149. Through the conduct of Defendant Martin and other BOP employees, all of the duties encompassed by this count were breached, and as a proximate result Plaintiff sustained injuries and damages.

150. As a direct and proximate result of these breaches of duties, K.J. suffered personal injuries associated with and arising from multiple sexual assaults and battery including, but not limited to, severe physical and emotional injury, depression, post-traumatic stress, embarrassment, and other damages, all or some of which shall continue indefinitely or permanently, as well as retaliation, and Defendant United States of America is consequently liable to Plaintiff for all of her compensatory damages recognized and allowable under applicable law.

### COUNT III – CLAIMS AGAINST THE UNITED STATES OF AMERICA UNDER THE FTCA: ASSAULT AND BATTERY

151. K.J. re-alleges and incorporates by reference all of the preceding allegations of this Complaint.

152. The actions of Defendant Martin constitute assault and battery in violation of state law.

153. Defendant Martin assaulted and battered K.J. through, but not limited to, unwanted, non-consensual sexual abuse, sexual assault, and harassment.

154. All of Defendant Martin's acts and omissions were taken while acting under color of law and in the scope and course of his position as a Corrections Officer at FCC Hazelton.

155. As a result of Defendant Martin's sexual assault and battery, K.J. suffered physical and emotional injury, depression, post-traumatic stress, embarrassment, and other damages, all or some of which shall continue indefinitely or permanently.

156. Under the Federal tort Claims Act, the Defendant, United States of America, is liable to K.J. for the unlawful actions of Defendant Martin as he was acting within the scope of his employment as a law enforcement officer of the United States BOP.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Honorable Court grant her the following relief:

1. Compensatory damages as to all Counts;

2. Punitive damages as to Count I against Defendant Martin, and not as to any Count against the United States of America;

3. Reasonable attorneys' fees and costs in accordance with applicable law; and,

4. Such other further relief as this Court in its discretion deems just.

## JURY DEMAND

Plaintiff hereby demands a jury trial on any and all Counts so triable under applicable law.

**K.J.,**
Plaintiff

*/s/Jay T. McCamic*
Jay T. McCamic, Esq. (WVSB#2386)
McCamic Law Firm, PLLC
80 12th Street, Ste. 305
P.O. Box 151
Wheeling, WV 26003
Telephone: 304-238-9460
Fax: 304-830-5324
jay@mccamic.com

23

*s/ Benjamin Adams*
Benjamin Adams, Esq. (WVSB# 11454)
Calwell Luce diTrapano, PLLC
500 Randolph Street
Charleston, WV 25302
Telephone: 304-343-4323
Fax: 304-344-3684
badams@cldlaw.com
L. Danté diTrapano, Esq. (WVSB#6778)
dditrapano@cldlaw.com

*s/Anthony I. Werner*
Anthony I. Werner, Esq. (WVSB#5203)
John & Werner Law Offices, PLLC
Board of Trade Building, STE 200
80 - 12th Street
Wheeling, WV 26003
Telephone: 304-233-4380
Fax: 304-233-4387
awerner@johnwernerlaw.com

*s/W. Jesse Forbes*
W. Jesse Forbes, Esq. (WVSB #9956)
FORBES LAW OFFICES, PLLC
1118 Kanawha Blvd., East
Charleston, WV 25301
Phone:304-343-4050
Fax:304-343-7450
wjforbes@forbeslawwv.com